NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0151n.06

No. 20-6382

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Apr 08, 2022 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MARK BRYANT, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | **OPINION** |
| | ) | |

Before: DONALD, THAPAR, and LARSEN, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** This case arises from the unlawful use of force employed by defendant appellant Mark Bryant, a former supervisory officer, in tasing a restrained pretrial detainee at the Cheatham County Jail in Ashland City, Tennessee. Following a three-day jury trial, Bryant was convicted of two counts of willful deprivation of constitutional rights, in violation of 18 U.S.C. § 242. Bryant appealed, challenging the sufficiency of the evidence supporting his convictions. Bryant's sole argument centers around an oft-disputed element: intent. For the following reasons, we affirm.

**I.**

A taser is an "electronic immobilization device" classified as "an intermediate weapon system." A taser can be used in two ways: (1) by ejecting probes into the detainee, also known as "prong" mode, or (2) by pressing the taser directly against the detainee's body, also known as "drive stun" mode. Drive-stun mode produces a more intensified pain than prong mode. Prong

mode leaves "two little bee sting marks" on the individual, while drive-stun mode "leaves a nasty burn." When in drive-stun mode, one pull of the trigger activates a five-second burst and a continuous hold on the trigger activates a perpetual burst.

Upon employment with the Cheatham County Sheriff's Office, every officer receives a copy of the institution's use of force policy and taser policy. Paragraph 3.2 of the use of force policy provided: "Officers shall use only the minimum amount of force necessary to control a person or situation." Paragraph 6.2.2 of the taser policy echoed the use of force policy, stating: "Use only the minimum number of bursts and minimum duration reasonably necessary to achieve the desired effect of temporarily immobilizing the individual." The taser policy further instructed officers to "deploy the taser consistent with department-approved training."

Gary Ola, a patrol sergeant with the Cheatham County Sheriff's Office, served as the taser instructor for the Cheatham County Jail. Ola taught officers to use a taser only for the purpose of "neutraliz[ing] a threat." Examples of neutralizing a threat include capturing a fleeing suspect, negating violence, and administering pain compliance. In accordance with the taser policy, Ola also instructed officers to use the least amount of force necessary to neutralize a threat. Ola told them to "[p]ull the trigger one time, release it, let it fire its five seconds, reassess the situation and see if you need to pull it again. If you do, repull and reassess the situation." As a general rule, Ola imposed a duration limit of fifteen seconds—or three trigger pulls of five seconds each. Officers could deviate from the general rule only under extenuating circumstances, such as to prevent loss of life or serious bodily injury.

## II.

Mark Bryant worked as a correctional officer at the Cheatham County Jail in Ashland City, Tennessee, from August 2015 to September 2017. On November 5, 2016, shortly before 7:00

p.m., Bryant, a shift supervisor at the time, observed Jordan Norris, a pretrial detainee, aggressively posture toward another inmate in the booking cell. Bryant and another correctional officer, Jeff Key, removed Norris from the cell, placed him against a wall, and attempted to cuff his hands. Norris forcefully resisted, so Bryant instructed a third correctional officer, Josh Marriott, to get the restraint chair. Bryant also called a fourth correctional officer, Daniel Bratton, for assistance.

When Bratton arrived in the booking area, Norris was partially restrained; he had only one hand inside the handcuffs. Bratton unholstered his taser and ordered Norris to stop resisting. Norris refused and Bratton drive-stun tased between Norris' shoulder blades for less than five seconds. After a brief pause, Norris continued fighting and Bratton again tased Norris' shoulder for a couple seconds. This time, the officers were able to cuff Norris' other hand and place him in the restraint chair.

Once in the chair, Norris arched his back and started kicking at the officers. Bratton administered one final tase to Norris' abdomen. The officers then secured Norris in the chair, placing restraint straps across his shoulders, arms, lap, and feet. With Norris restrained, Bratton returned to the sally port area of the jail. Approximately twelve minutes later, Bryant removed the handcuffs and secured Norris' wrists with the chair's restraint straps.

Around 7:55 p.m., Norris managed to loosen one of the restraint straps and partially free his right hand. Norris then started thrashing, spitting, and attempting to headbutt the officers. Key placed a mesh spit mask over Norris' face and tried wrangling his arm back into the restraint. Marriott grabbed underneath Norris' jawline to prevent any head movement. A minute later, Key

called Bryant over to assist with the arm restraint strap. Bryant kneeled in front of Norris and immediately asked another correctional officer, Caitlin Johnson[1], to bring him a taser.

Over the next minute and a half, Bryant drive-stun tased Norris four times for a total of fifty seconds. Bryant first tased Norris in the chest for five seconds, asking "Are you ready?" Bryant then moved the taser to Norris' left thigh and administered another five-second cycle. Immediately thereafter, Bryant tased Norris' thigh for an additional twenty-five seconds. During that time, Bryant commented, "You don't like it, do you?" and "I can do this until the batteries run out." Bryant then administered one final fifteen second tase to Norris' right thigh. After Key successfully restrained Norris' right hand, Bryant expressed concern to Marriott that "maybe that he overdone it" and "he had gone too far."

Later that night, Bryant called the mobile crisis unit because Norris was conveying suicidal ideations. The crisis unit arrived shortly before 10:00 p.m., when night shift was scheduled to begin. To prepare him for transport, seven officers, including Bryant, tried to belly chain, handcuff, and ankle shackle Norris. Norris struggled and fought with the officers for over ten minutes. Bryant drive-stun tased Norris five times before they were able to fully restrain him. Bryant and another correctional officer, Rebecca Burney, then gathered loose straps from the ground to be able to roll the chair outside. When Bryant knelt down, Norris moved his leg and Bryant tased his shin for eleven seconds.

Afterwards, the officers took Norris outside and tried to place him into the patrol unit. However, Norris used one of his legs to wedge himself in the door jam. Ola instructed Steven Montgomery, the night-shift supervisor, to drive-stun tase the back of Norris' calf. Montgomery

---

[1] Caitlin Johnson subsequently married Josh Marriott and changed her last name to Marriott. However, we continue to use her maiden name to avoid confusion.

complied and, after one second, Norris pulled his leg inside the car. Norris was subsequently transported to the Centennial Ashland City Medical Center for a medical evaluation.

Anytime tasers were used in the jail, the Cheatham County Sheriff's Office required the attending officers to fill out an incident report and a use of force report. However, Bryant told Marriott and Johnson that they "didn't need to" write use of force reports. He similarly told Bratton "not to worry about" writing a use of force report. Bryant informed the officers that he "would take care of it." At the end of his shift, Bryant submitted two incident reports and zero use of force reports.

The following week, JJ Hannah, the Cheatham County Jail Administrator, met with Bryant and informed him that the Cheatham County Sheriff's Office would be conducting an internal investigation. Following its investigation, the Cheatham County Sheriff's Office found Bryant's actions to be justified and declined to take any disciplinary actions. Five months later, in July 2017, video footage from the jail security cameras was leaked to the media. In the wake of the media attention, Bryant was terminated.

On June 20, 2018, a federal grand jury returned a four-count indictment against Bryant. Counts One and Two charged Bryant with willfully depriving Norris of his constitutional rights—namely, his due process right to be free from the use of unreasonable force—in violation of 18 U.S.C. § 242. Counts Three and Four charged Bryant with knowingly falsifying documents to impede a federal investigation, in violation of 18 U.S.C. § 1519. Following a four-day trial that resulted in a hung jury and mistrial, another federal grand jury returned a five-count superseding indictment against Bryant. In addition to the original four counts, the superseding indictment charged Bryant with one count of making false statements to a federal agent, in violation of 18 U.S.C. § 1001(a)(2). The matter proceeded to a second jury trial on January 7, 2020. After three

days of evidence, the jury convicted Bryant of willfully depriving Norris of his constitutional rights but acquitted him of falsifying reports and providing false information to government agents. The district court subsequently sentenced Bryant to sixty months' imprisonment.

Bryant appealed, challenging the sufficiency of the evidence and arguing that the government failed to prove he acted "willfully."

**III.**

As a preliminary matter, the government contends that Bryant waived his sufficiency challenge by failing to raise it in his motion for judgment of acquittal. We agree.

After the government's case-in-chief, Bryant orally moved for judgment of acquittal. He argued that the evidence failed to show that he intended to obstruct the government's investigation as it related to Counts Three and Four—the falsifying reports counts. However, he did not argue that the evidence failed to show that he willfully used unreasonable force as it related to Counts One and Two—the willful deprivation counts. In fact, he conceded that Counts One and Two "are really jury issues. They're going to have to wade through the credibility of the issues and determine the excessive force counts which are alleged in Counts One and Two." In response, the government clarified, "I understand the defense to not be arguing that Counts One, Two, or Five are not appropriate jury questions, so I'll focus just briefly on Counts Three and Four." Bryant never objected to the government's characterization. Following the conclusion of his case-in-chief, Bryant orally renewed his motion for judgment of acquittal. He made no new arguments; choosing instead to "rely on all of the arguments that [he] made."

Where a defendant does not move for judgment of acquittal pursuant to Rule 29, appellate review is limited to determining whether there was a "manifest miscarriage of justice." *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998). But where, as here, the defendant raises some

6

grounds in a motion for judgment of acquittal and omits other grounds, "this court generally does not review the omitted grounds at all; i.e., we deem them completely waived." *United States v. Martinez-Lopez*, 747 F. App'x 326, 331 (6th Cir. 2018) (emphasis omitted). *See United States v. Osborne*, 886 F.3d 604, 618 (6th Cir. 2018); *United States v. Winkle*, 477 F.3d 407, 415 (6th Cir. 2007); *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005); *but cf*, *United States v. LaVictor*, 848 F.3d 428, 457 (6th Cir. 2017) (applying "manifest miscarriage of justice" standard); *United States v. Guadarrama*, 591 F. App'x 347, 351 (6th Cir. 2014) (same). Bryant has therefore waived any challenge to the sufficiency of the evidence supporting Counts 1 and 2.

## IV.

For the foregoing reasons, Bryant's convictions and sentence are **AFFIRMED**.